THOMSON v DETROIT AUTOMOBILE INTER-INSURANCE
EXCHANGE

Docket No. 64820. Submitted June 14, 1983, at Lansing.—Decided
April 2, 1984. Leave to appeal applied for.

Plaintiff, Joan Thomson, was injured in an automobile accident
on January 23, 1979. At the time of the accident plaintiff was
insured by defendant, Detroit Automobile Inter-Insurance Ex-
change. Plaintiff began treatment with Dr. George Fuksa, an
orthopedic surgeon, on January 25, 1979. The treatment contin-
ued until March 5, 1979, when Dr. Fuksa determined that
plaintiff was symptom-free and discharged her, sending a report
to the defendant. Plaintiff again began experiencing pain on
July 24, 1979, and was seen by Dr. Fuksa's associate, Dr.
Harris, who prescribed treatment similar to that utilized previ-
ously. The plaintiff, on July 26, 1979, began treatment with Dr.
Cyril Hackett, a chiropractor. By June 18, 1981, Dr. Hackett
had treated plaintiff 168 times for what he determined to be
accident-related sprains. The defendant then requested Dr.
John DeBruin, an orthopedic surgeon, to conduct an examina-
tion of the plaintiff. Dr. DeBruin's report was received by the
defendant on November 14, 1980. The report indicated that Dr.
DeBruin found no evidence of organic disease, that plaintiff
could work without restrictions, and that the complaints pre-
sented by plaintiff were consistent with trauma caused by the
automobile accident except for the duration of the symptoms.

REFERENCES FOR POINTS IN HEADNOTES

[1, 7] 5 Am Jur 2d, Appeal and Error § 772.

[1, 2, 6, 7, 10] 7 Am Jur 2d, Automobile Insurance §§ 343-345.
    Validity and construction of "no-fault" automobile insurance plans.
    60 ALR3d 651.

[2] 31 Am Jur 2d, Expert and Opinion Evidence §§ 26, 27.

[3, 5] 61 Am Jur 2d, Physicians, Surgeons, and Other Healers § 5.

[4, 5] 61 Am Jur 2d, Physicians, Surgeons, and Other Healers § 2.

[8] 7A Am Jur 2d, Automobile Insurance § 458.

[9] 7 Am Jur 2d, Automobile Insurance §§ 343, 346.

[10] 20 Am Jur 2d, Costs § 72.
    Amount of compensation of attorney for services in insurance
    matters in absence of contract or statute fixing amount. 56
    ALR2d 187.

On November 14, 1980, defendant informed plaintiff and Dr. Hackett that it would not pay further personal protection insurance benefits for treatment received by plaintiff from Dr. Hackett without further medical documentation to substantiate plaintiff's claims. Plaintiff thereafter brought an action in the Ingham Circuit Court against the defendant alleging breach of contract and intentional infliction of emotional distress and mental anguish. The parties settled prior to trial and a stipulation and order of dismissal was entered dismissing the action in its entirety except for the matter of attorney fees. It was agreed that the settlement did not constitute an admission of liability by the defendant. The trial judge, Thomas L. Brown, J., then agreed with the plaintiff's assertion that defendant's failure to pay benefits had been unreasonable and ordered defendant to pay plaintiff's attorney fees of $5,568.75, plus $898.86 in costs. Defendant appeals from that order. *Held:*

1. The defendant's refusal to pay personal protection benefits was reasonable under the facts of this case.

2. The trial court's findings were clearly erroneous; the trial court erred in finding no legitimate question of factual uncertainty in this case.

3. Dr. DeBruin's medical report can be reasonably read and was reasonably read by defendant's adjuster as contraindicating further payment for chiropractic treatments, thus creating a legitimate or bona fide question of factual uncertainty. There is no support for the trial court's assumption that it is outside the scope of an orthopedic surgeon's area of competence to evaluate plaintiff's need for further medical and/or chiropractic treatment for neck and back injuries.

4. It is not improper for a medical witness to testify at trial about a field or specialty of medicine in which the witness does not practice; it is not improper for an insurance adjuster to rely on the opinion of a medical doctor about a field or sub-specialty to which that doctor's practice is not limited; the test under the statute regarding attorney fees to be awarded when an insurer unreasonably refused to pay a claim or unreasonably delayed in making a proper payment is whether the adjuster's reliance on the opinion of that doctor is reasonable under the circumstances.

5. No evidence was presented indicating that Dr. DeBruin was lacking in the training, skill, or experience required to allow him to provide an opinion on plaintiff's state of health and need for further medical treatment.

Reversed.

SHEPHERD, J., dissented and would hold that the trial court did not err in finding defendant's refusal to pay continued benefits unreasonable. He would hold that the trial court did not clearly err in finding that the conflict between the medical reports of Drs. Fuksa and DeBruin and the chiropractic report of Dr. Hackett did not create a bona fide factual uncertainty. He does not believe that the apparently conflicting reports, uninvestigated by the defendant, constituted a bona fide factual uncertainty. He would not interpret the trial court's statements to require the opinion of another chiropractor before defendant could reasonably terminate payment for plaintiff's treatments. He does not believe that Dr. DeBruin's report was adequate justification for the cessation of payment for chiropractic treatment. He would find, however, that the attorney fees awarded were excessive because some of the amount was attributable to non-no-fault issues. He would affirm but remand for a reduction to conform to the time spent only on plaintiff's no-fault claim.

OPINION OF THE COURT

1. APPEAL — INSURANCE — NO-FAULT INSURANCE — ATTORNEY FEES.

The Court of Appeals, in an appeal from an award of attorney fees as a result of an unreasonable refusal by a no-fault insurer to pay personal protection insurance benefits, focuses on the reasons stated on the record by the trial court for its finding of an unreasonable refusal and will not reverse unless the Court of Appeals is left with a definite and firm conviction that a different result would have been reached had it sat in the position of the trial court (MCL 500.3148; MSA 24.13148).

2. WITNESSES — MEDICAL WITNESSES — INSURANCE — NO-FAULT INSURANCE — ATTORNEY FEES.

It is not improper for a medical witness to testify at trial about a field or specialty of medicine in which the witness does not practice; therefore, it is not improper for an insurance adjuster to rely on the opinion of a medical doctor about a field or sub-specialty to which the doctor's practice is not limited; the test under the no-fault insurance statute regarding the award of attorney fees when an insurer unreasonably refuses to pay a claim or unreasonably delays in making a proper payment is whether the adjuster's reliance on the opinion of that doctor to support such nonpayment or delay is reasonable under the circumstances (MCL 500.3148; MSA 24.13148).

3. PHYSICIANS AND SURGEONS — PRACTICE OF CHIROPRACTIC.

The Public Health Code defines "practice of chiropractic" to

mean that discipline within the healing arts which deals with the nervous system and its relationship to the spinal column and its interrelationship with other body systems (MCL 333.16401[1][b]; MSA 14.15[16401][1][b]).

4. PHYSICIANS AND SURGEONS — PRACTICE OF MEDICINE.

The Public Health Code defines the general practice of medicine as the diagnosis, treatment, prevention, cure, or relieving of a human disease, ailment, defect, complaint, or other physical or mental condition (MCL 333.17001[1][c]; MSA 14.15[17001][1][c]).

5. PHYSICIANS AND SURGEONS — PRACTICE OF CHIROPRACTIC — PRACTICE OF MEDICINE.

The practice of chiropractic is a narrow subfield of the general practice of medicine (MCL 333.16401[1][b], 333.17001[1][c]; MSA 14.15[16401][1][b]; 14.15[17001][1][c]).

6. INSURANCE — NO-FAULT INSURANCE — DELAY IN PAYMENTS — ATTORNEY FEES.

A delay by an insurer in paying personal protection insurance benefits will not be found unreasonable within the meaning of the statute regarding an award of attorney fees for an unreasonable refusal or delay in the payment of benefits where the delay is the result of a legitimate or bona fide question of factual uncertainty (MCL 500.3148; MSA 24.13148).

DISSENT BY SHEPHERD, J.

7. INSURANCE — NO-FAULT INSURANCE — ATTORNEY FEES — APPEAL — COURT RULES.

*A trial court may award a claimant a reasonable attorney fee when it finds that an insurer unreasonably refused to pay a claim or unreasonably delayed in making proper payment; the reasonableness of the insurer's refusal is a matter for the trial court's determination which will not be disturbed on appeal unless such finding was clearly erroneous; the trial court's findings will be deemed clearly erroneous when the Court of Appeals is left with the definite and firm conviction that a mistake has been committed or that the findings of the trial court were contrary to the great weight of the evidence (MCL 500.3148[1]; MSA 25.13148[1]; GCR 1963, 517.7).*

8. INSURANCE — NO-FAULT INSURANCE — REFUSAL TO PAY.

*A refusal of an insurer to pay personal protection insurance benefits is not unreasonable where it is based on a legitimate question of statutory construction, constitutional law, or bona fide factual uncertainty.*

9. INSURANCE — NO-FAULT INSURANCE — TERMINATION OF BENEFITS.

> An insurer which has previously paid personal protection insurance benefits to an insured for a substantial period of time and which has been supplied continuing reports by the insured's treating physician of the insured's need for treatment should not, on the basis of one conflicting report which is based on one relatively brief examination by another physician conducted at the insurer's behest, be allowed to terminate unilaterally the payment of benefits without making a reasonable attempt to resolve the conflict.

10. INSURANCE — NO-FAULT INSURANCE — ATTORNEY FEES.

> An award of attorney fees pursuant to the no-fault insurance act's provision regarding the award of such fees when an insurer unreasonably refuses to pay a claim or unreasonably delays in making a proper payment should be limited to compensation for the time spent by the insured's attorney which is attributable only to no-fault issues (MCL 500.3148; MSA 24.13148).

*Church, Wyble, Kritselis & Robinson, P.C.* (by *Brian W. Bevez*), for plaintiff.

*Willingham, Coté, Hanslovsky, Griffith & Foresman, P.C.* (by *Frederick M. Baker, Jr.,* and *Brian J. Renaud*), for defendant on appeal.

Before: M. J. KELLY, P.J., and SHEPHERD and R. I. COOPER,* JJ.

M. J. KELLY, P.J. In this case, we are asked to evaluate the reasonableness of defendant insurer's refusal to pay plaintiff insured's medical bills incurred after November 14, 1980, thus determining whether plaintiff may recover attorney fees under MCL 500.3148; MSA 24.13148. The facts are contained in Judge SHEPHERD's dissent, and supplemented slightly in the discussion which follows. We reverse the trial court's attorney fee award as we find that defendant's refusal to pay personal

---

* Circuit judge, sitting on the Court of Appeals by assignment.

protection benefits was reasonable under the facts of this case.

Plaintiff was involved in an automobile accident on January 23, 1979. Following treatment with an orthopedic surgeon, Dr. George Fuksa, plaintiff underwent 39 chiropractic treatments with Dr. Cyril Hackett between July 26, 1979, and October 2, 1979. At the end of those treatments, Dr. Hackett concluded in a report to the defendant that plaintiff had made "good progress". After plaintiff received 39 additional chiropractic treatments, the defendant's adjuster wrote to Dr. Hackett:

"I am concerned with Mrs. Thomson's progress and do not fully understand why after seventy-eight treatments, she still continues to require treatment with such regularity.

"Your report of November 14, 1979, presented a picture of a lady well on her way to recovery. Six months later, after 29 treatments, she is 'down' to one treatment a week.

"I'm sure that you are convinced that a complete correction is possible and even likely.

"I'm also sure that the company will require an independent medical examination in the very near future, in order to justify the continuing payment of your bills."

On August 14, 1980, plaintiff was examined at defendant's request by Dr. John DeBruin, a board certified orthopedic surgeon, who opined that plaintiff had no objective symptomatology and that, although she complained of tightness and stiffness, he could find no objective support to explain her symptoms. Dr. DeBruin suggested malingering and exaggeration on the part of plaintiff. Based on Dr. DeBruin's report, as well as on Dr. Fuksa's earlier report releasing plaintiff from treatment and on Dr. Fuksa's October 30, 1979,

report finding no need for further treatment, defendant, on November 14, 1980, declined to make any further payments for treatments received by plaintiff from Dr. Hackett.

Because this appeal is solely from the attorney fee award, we must focus on the reasons stated on the record by the trial court for finding defendant's refusal to continue payments unreasonable and determine whether we are left with a definite and firm conviction that a different result would have been reached had we sat in the position of the trial court. *Tuttle v Dep't of State Highways,* 397 Mich 44, 46; 243 NW2d 244 (1976); *Precopio v Detroit,* 415 Mich 457, 462; 330 NW2d 802 (1982). In concluding that the defendant had unreasonably refused to continue to pay plaintiff's chiropractic bills in the face of Dr. DeBruin's medical opinion contraindicating such further chiropractic manipulation, the trial court stated:

"The court believes under the circumstances of this case that the insurer defendant was wrong, and that their refusal was an unreasonable one. The court believes they should have made a more concerted effort to make a proper determination of whether or not Dr. Hackett's services were appropriately performed prior to unilaterally, let us say, cutting off of *[sic]* the lady's payment to the lady's doctor.

"In the court's opinion they had means available to them of a more reasonable nature prior to their termination of these benefits. And even taking that into account, the examining doctor, Dr. DeBruin's examination of her, and the basis for cutting off the benefit, the court is of such a belief that is appropriate, too, in view of Dr. DeBruin's finding. He did not find any objective injury. He found that she was suffering from some subjective symptoms, and that her symptoms were consistent with the injury she received, and that he would have treated her for the injuries she received."

After the court was informed or reminded that the benefits were suspended only after an independent medical evaluation was obtained from Dr. DeBruin, the court amended its opinion as follows:

"I think I meant to say that they should have—they should have under the circumstances—let me clarify that so there is no confusion.

"Based upon Dr. DeBruin's report I think it would have been advisable and reasonable for the insurer to seek another examination if they wanted—wanted to cut off the support. I think that's my point, I wish to make, is that it would have been better for them based upon what Dr. DeBruin said.

* * *

"I think now based upon what he said the insurer would have been—would have been wiser for the insurer to seek another examination, because based upon what he said I don't think it was—that was adequate finding for them to terminate payment to Dr. Hackett.

"I think that is what I meant to convey. Perhaps I wasn't as lucid or erudite as I should have been. This is just kind of an off-the-cuff pronouncement here.

* * *

"Well, I think that points up very accurately why the insurer should have sought to have information from another chiropractor, if it's within the chiropractic discipline on objective findings which cannot be determined by the medical profession; that I think it would have been wise for the insurer to check out those, Dr. Hackett's objective findings with another chiropractor. That would have been one course they could have taken."

As we read the trial court's somewhat labored pronouncements, two messages are conveyed. First, the trial court indicates that Dr. DeBruin's medical report cannot reasonably be read as contraindicating further medical treatment for plaintiff. Second, the court concludes that even if the

report did contraindicate further medical treatment, the doctor was probably outside the scope of an orthopedic surgeon's area of competence in evaluating the need for further chiropractic manipulation. Finally, the trial judge concluded that because of this difference the defendant should have obtained a second independent report from another chiropractor before terminating plaintiff's benefits.

We believe the trial court's findings are clearly erroneous. We find that the report can be reasonably read and was read by the defendant's adjuster as contraindicating further payment for chiropractic treatments, thus creating a legitimate or bona fide question of factual uncertainty. *Aetna Casualty & Surety Co v Starkey,* 116 Mich App 640, 647; 323 NW2d 325 (1982), *lv den* 417 Mich 929 (1983).

More importantly, however, we believe that the trial court erred in concluding that it was necessary for the defendant to obtain the opinion of another chiropractor before terminating payment for plaintiff's chiropractic treatments. We simply find no support for his assumption that it is outside the scope of an orthopedic surgeon's area of competence to evaluate plaintiff's need for further medical and/or chiropractic treatment for neck and back injuries.

While we find no Michigan cases addressing the quantum or competency of medical evidence required to support a finding of reasonableness in an insurer's termination of medical benefits, we find it instructive to consider case law analyzing the competency of medical expert testimony under MRE 702. This Court has consistently held that a medical witness need not specialize in the same field or subfield regarding which he is asked to

testify. *Wolak v Walczak,* 125 Mich App 271, 276; 335 NW2d 908 (1983) (in a medical malpractice action, an obstetrician-gynecologist may testify about the effect of bilirubin in newborns); *Pietrzyk v Detroit,* 123 Mich App 244; 333 NW2d 236 (1983), *lv den* 417 Mich 1100.5 (1983) (in medical malpractice action, a medical doctor's 20-year absence from the emergency room setting did not preclude him from testifying about the standard of care in an emergency room); *Phardel v Michigan,* 120 Mich App 806; 328 NW2d 108 (1982), *lv den* 417 Mich 1015 (1983) (in wrongful death action against the state, medical doctor who was not a specialist in neurological or cardiac surgery is competent to testify about cause of death involving a subarachnoid hemorrhage); *Earls v Herrick,* 107 Mich App 657; 309 NW2d 694 (1981) (in automobile negligence action, a board certified orthopedic surgeon who was not a plastic surgeon is not precluded from testifying about permanent scarring). The test in all of these cases is not whether the witness providing the opinion practices in the same field, discipline or specialty, but rather, whether the witness had sufficient training, skill, expertise, or knowledge in the field to provide competent testimony.

Moreover, we note that the Michigan Public Health Code defines the "practice of chiropractic" to mean "that discipline within the healing arts which deals with the nervous system and its relationship to the spinal column and its interrelationship with other body systems". MCL 333.16401(1)(b); MSA 14.15(16401)(1)(b). The practice of chiropractic is clearly a narrow subfield of the general practice of medicine, which is defined in the Public Health Code as "the diagnosis, treatment, prevention, cure, or relieving of a human

disease, ailment, defect, complaint, or other physical or mental condition * * *'". MCL 333.17001(1)(c); MSA 14.15(17001)(1)(c).

We believe that if it is not improper for a medical witness to testify at trial about a field or specialty of medicine in which the witness does not practice, then it is certainly not improper for an insurance adjuster to rely on the opinion of a medical doctor about a field or sub-specialty to which that doctor's practice is not limited. Under MCL 500.3148; MSA 24.13148, the test is whether the adjuster's reliance on the opinion of that doctor is reasonable under the circumstances. Since there is no evidence on this record that Dr. De-Bruin was lacking in the training, skill, or experience required to allow him to provide an opinion on plaintiff's state of health and the need for further medical treatment and since, as we have already found, Dr. DeBruin's report was reasonably read to contraindicate the need for further treatment, we are left with the definite and firm conviction that the trial court erred in finding no legitimate question of factual uncertainty in this case.

Reversed.

R. I. COOPER, J., concurred.

SHEPHERD, J. *(dissenting)*. I respectfully dissent. Plaintiff, Joan Thomson, brought an action against defendant, Detroit Automobile Inter-Insurance Exchange, seeking recovery of no-fault benefits after defendant refused to continue paying for plaintiff's chiropractic treatments. In her complaint, plaintiff also alleged breach of contract and intentional or negligent infliction of emotional distress and mental anguish. On the day trial was to begin the parties settled and a stipulation and order of

dismissal was entered on June 21, 1982, dismissing the action in its entirety except for the matter of attorney fees.

The basic facts underlying this appeal are not in dispute. Plaintiff received a neck injury in an automobile accident on January 23, 1979. At the time of the collision, plaintiff was insured by defendant. She began treatment with Dr. George Fuksa, an orthopedic surgeon, on January 25, 1979. Treatment, consisting of hot packs, ultrasound, massage, a cervical collar, and pain medication, continued until March 5, 1979, when Dr. Fuksa determined that plaintiff was symptom-free and discharged her. A report so indicating was sent to defendant.

On July 24, 1979, plaintiff again began experiencing pain. She contacted Dr. Fuksa's office and was seen by his associate, Dr. Harris. Dr. Harris prescribed treatment similar to that utilized previously and told plaintiff to see Dr. Fuksa in two weeks when he returned from vacation. Instead, plaintiff began treating with Dr. Cyril Hackett, a chiropractor, on July 26, 1979. Dr. Hackett diagnosed cervical, thoracic and lumbar sprains and concluded that the automobile accident which had occurred in January was the cause of the symptoms described by plaintiff, which included severe constant pain in various portions of her upper body. Plaintiff visited Dr. Hackett daily for six weeks, then gradually decreased her visits to once every two weeks. Dr. Hackett advised defendant that a longer than normal recovery period could be expected. By June 18, 1981, Dr. Hackett had treated plaintiff 168 times.

Defendant paid all chiropractic and medical bills incurred by plaintiff until November 14, 1980, when it received a report from Dr. John DeBruin,

who had conducted an examination of plaintiff at defendant's request on August 14, 1980. In his report, Dr. DeBruin indicated that he found no evidence of organic disease, that plaintiff could work without restrictions, and that the complaints presented by plaintiff were consistent with trauma caused by the automobile accident except for the duration of her symptoms.

Prior to receiving Dr. DeBruin's report, defendant had received two reports from Dr. Fuksa: the first in March of 1979 indicating that plaintiff was symptom free; and the second on October 30, 1979, outlining the course of plaintiff's prior treatment and recalling that, by her fourth visit (in March, 1979) plaintiff had "improved and she did very well. She didn't have any pain and all spasms were gone. She was very happy with her situation". Dr. Hackett, plaintiff's chiropractor, also supplied defendant with several reports indicating that plaintiff had not been cured but was making progress. Upon being informed by defendant on November 14, 1980, that further chiropractic expenses would not be reimbursed, Dr. Hackett advised defendant that plaintiff was in need of continued treatment, that her injuries had not been fully corrected, and that a maintenance schedule of treatment was required in order to prevent relapse.

Defendant, however, terminated its payment of benefits based on the inconsistency of the reports received from Dr. Fuksa and Dr. DeBruin on the one hand, and Dr. Hackett on the other. Termination occurred upon receipt of Dr. DeBruin's report when defendant informed plaintiff that it would be unable to pay further personal protection benefits without further medical documentation to substantiate her claims.

Following the commencement of legal proceedings, the parties eventually settled for $847, the amount owed Dr. Hackett for treatments incurred after November 14, 1980. It was agreed that settlement did not constitute an admission of liability by defendant. Plaintiff requested attorney fees pursuant to MCL 500.3148; MSA 24.13148, asserting that defendant's failure to pay benefits had been unreasonable. The trial court agreed and ordered defendant to pay plaintiff's attorney fees of $5,568.75, plus $898.86 in costs.

On appeal, defendant raises two allegations: first, that the trial court erred in finding defendant's refusal to pay continued benefits unreasonable, and, second, that if an award of attorney fees was proper, the amount awarded was excessive. I disagree with defendant's first contention but concur with its second.

A trial court may award a claimant a reasonable attorney fee where it finds that an insurer "unreasonably refused to pay the claim or unreasonably delayed in making proper payment". MCL 500.3148(1); MSA 25.13148(1). A trial court's finding that an insurance company's refusal to pay personal protection (popularly known as PIP) benefits was unreasonable will not be disturbed on appeal unless it is clearly erroneous. GCR 1963, 517.1; *Butler v Detroit Automobile Inter-Ins Exchange,* 121 Mich App 727; 329 NW2d 781 (1982); *Kalin v Detroit Automobile Inter-Ins Exchange,* 112 Mich App 497; 316 NW2d 467 (1982), *lv den* 417 Mich 853 (1982). Findings will be deemed clearly erroneous when this Court is left with the definite and firm conviction that a mistake has been committed or that the findings of the trial court were contrary to the great weight of the evidence. *Tuttle v Dep't of State Highways,* 397

Mich 44; 243 NW2d 244 (1976); *Stratton v Jensen,*
64 Mich App 602; 236 NW2d 527 (1975). The
reasonableness of an insurer's refusal to pay is a
matter for the trial court's determination. See
*Combs v Commercial Carriers, Inc,* 117 Mich App
67, 73; 323 NW2d 596 (1982), *lv den* 417 Mich 923
(1983). In the instant case, the trial court deter-
mined that defendant had unreasonably refused to
pay plaintiff's claim for chiropractic treatment
rendered after November 14, 1980. Defendant ar-
gues, and the majority agrees, that its refusal was
not unreasonable.

A refusal to pay benefits is not unreasonable
where it is based on a legitimate question of
statutory construction, constitutional law, or bona
fide factual uncertainty. *English v Home Ins Co,*
112 Mich App 468, 475-476; 316 NW2d 463 (1982);
*Liddell v Detroit Automobile Inter-Ins Exchange,*
102 Mich App 636, 650; 302 NW2d 260 (1981), *lv
den* 411 Mich 1079 (1981). The majority finds that
the conflict between the medical reports of Drs.
Fuksa and DeBruin and the chiropractic report of
Dr. Hackett created just such a factual uncer-
tainty in the instant case. The trial court found
otherwise, a finding which I cannot say was clearly
erroneous.

The reports submitted by Dr. Fuksa did indicate
that plaintiff was "symptom-free" and that treat-
ment for her neck injury was therefore no longer
necessary. The most recent of those two reports,
however, had been submitted in October, 1979.
The reports submitted by Dr. Hackett, on the
other hand, were current up to November 14,
1980, and indicated that, although she was improv-
ing, plaintiff continued to have health problems
which were related to the automobile accident.
The report submitted by Dr. DeBruin at defen-

dant's request reported no evidence of organic disease or muscle spasms; Dr. DeBruin could not substantiate plaintiff's subjective complaints and was of the opinion that plaintiff could work without restriction. This report was submitted in November, 1980, and was based on one office examination of plaintiff.

While there is clearly conflict between the reports, defendant made no effort to contact the doctors involved in order to resolve that conflict. Although defendant requested a report from Dr. Fuksa's associate, Dr. Harris, regarding the results of his treatment of plaintiff in July, 1979, defendant did not follow up on Dr. Harris's failure to supply such a report. Dr. DeBruin subsequently testified in a deposition that plaintiff did exhibit subjective symptoms consistent with the injuries she had sustained in the accident, although he thought the duration of her symptoms unusual. The trial court, in finding defendant's refusal to continue paying benefits unreasonable, said:

"The court believes they should have made a more concerted effort to make a proper determination of whether or not Dr. Hackett's services were appropriately performed prior to unilaterally * * * cutting off * * * payment to the lady's doctor. * * * Based on Dr. DeBruin's report I think it would have been advisable and reasonable for the insurer to seek another examination if they wanted * * * to cut off the support."

The trial court pointed out that the doctors' reports and their deposition testimony indicated that plaintiff had never been given a "clean bill of health" or pronounced fully cured by Dr. Fuksa, had been unable to obtain relief from Dr Harris, and had been found by Dr. DeBruin to have symptoms not inconsistent with her automobile acci-

dent. As was the case in *Liddell, supra,* however, where this Court affirmed a similar award of attorney fees, defendant made no effort to contact the various physicians involved in the case regarding their conflicting reports and made no effort to obtain additional reports in order to ascertain the true status of plaintiff's condition. While, as the majority points out, defendant had received two reports indicating that plaintiff was no longer injured while receiving only one which found continuing disability, one of those first two reports was over a year old at the time benefits were terminated. Furthermore, the second report did not absolutely rule out the existence of plaintiff's physical symptoms or their connection to the automobile accident. Defendant also failed to obtain a report from Dr. Harris, who had seen plaintiff immediately prior to the initiation of her chiropractic treatments. Defendant paid chiropractic and medical benefits for 1-1/2 years and then suddenly stopped payments on the basis of one medical report. I cannot agree with the majority that the apparently conflicting reports, uninvestigated by the defendant, constituted a bona fide factual uncertainty. Defendant simply chose to rely on the report most favorable to itself without making any effort to resolve the conflict. I would therefore affirm the trial court's determination that defendant's refusal to pay benefits was unreasonable and that plaintiff was entitled to recover attorney fees. Where an insurance company has previously paid PIP benefits for a substantial period and a plaintiff's treating physician supplies continuing reports of her need for treatment, the insurer should not be allowed, on the basis of one conflicting report which is based on one relatively brief examination conducted at the insurer's behest, to unilaterally terminate payment of per-

sonal protection benefits without making a reasonable attempt to resolve the conflict. This inequitably places upon the plaintiff the burden of substantiating a condition which has already been documented by her chosen physician and acknowledged by the insurance company. It creates the risk that necessary treatment may be delayed while the plaintiff seeks to provide enough proof to satisfy the insurer of the validity of her claim.

Unlike the majority, I do not interpret the trial court's statements to require the opinion of another chiropractor before defendant could reasonably terminate payment for plaintiff's treatments. After defendant had argued that medical doctors had failed to find the objective symptoms found by Dr. Hackett, the trial court suggested that defendant should have sought a second opinion from another chiropractor *"if it's within the chiropractic discipline on objective findings which cannot be determined by the medical profession; * * * That would have been one course they could have taken"*. (Emphasis added.) The trial court then noted again the failure of the treating medical doctors to say, with certainty, that plaintiff was cured or that she had no objective symptoms.

I cannot read these statements by the trial court as requiring a second chiropractor's opinion before it would deem defendant's termination of benefits reasonable. The court merely noted that the medical doctors involved had not unequivocally stated that plaintiff was cured and that *one means* of resolving the dispute would have been to seek a second chiropractor's opinion if plaintiff's *injuries* were of a type perhaps uniquely treated by those in the chiropractic profession. The trial court at no time found Dr. DeBruin's testimony to be inadequate or unreliable in itself; the court merely held

that the acquisition of one doctor's opinion to rebut the opinion of Dr. Hackett was insufficient to justify termination of benefits. I cannot conclude, as does the majority, that Dr. DeBruin's report, qualified though he may be, was adequate justification for the cessation of payment for plaintiff's chiropractic treatment.

Finally, although I agree with the trial court that plaintiff was entitled to attorney fees, I would have found the fees awarded to have been excessive. Plaintiff was awarded the entire amount of attorney fees requested although it was clear that some of the hours billed were attributable to non-no-fault issues and therefore could not be assessed against defendant. See *Liddell, supra,* p 649; *State Farm Mutual Automobile Ins Co v Allen,* 50 Mich App 71, 74; 212 NW2d 821 (1973). At most, therefore, I would affirm the award of attorney fees itself but remand for reduction to conform to the time spent only on plaintiff's no-fault claim.